EDWARD J. ROBINSON *v.* STATE OF MARYLAND

[No. 386, September Term, 1972.]

*Decided April 6, 1973.*

452

The cause was argued before MORTON, MOYLAN and MENCHINE, JJ.

*Leonard J. Kerpelman* for appellant.

*Mary Elizabeth Kurz, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City,* and *James Eagan, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

Although every unauthorized use not amounting to an Unauthorized Use may not establish the element of a trespassory taking, hearsay (even twice compounded) may. Thus the conviction of the appellant, Edward J. Robinson, in a non-jury trial in the Criminal Court of Baltimore, for the Unauthorized Use of an Automobile in violation of Article 27, § 349, will be sustained for one reason, if not for another. The appellant, also convicted of receiving stolen goods and of possession of a deadly weapon, here appeals all three convictions. We will consider first the conviction for the Unauthorized Use of an Automobile.

On August 20, 1971, the National Car Rental System, located at 1915 N. Howard Street, leased a 1971 Matador to one Robert William Anderson. The period of the lease was to run through August 23, 1971. By the terms of the lease, Mr. Anderson was not to permit the vehicle to be operated by any person who was not a qualified licensed driver and who was not furthermore a member of his immediate family or his employee.

On the following day, August 21, 1971, at approximately 4:30 p.m., Officer Monroe Gilliam was on patrol in the 1500 block of Pennsylvania Avenue. He was looking for the appellant who was at that time an escapee from the Maryland Department of Correction and who was reputed to be planning to rob a bank. He had in his possession a picture of the appellant. Spotting the appellant driving an automobile, he hailed the vehicle to the curb, alighted from his own patrol car, and approached the stopped automobile. As he reached the rear fender of the stopped car, it suddenly took off at a high rate of speed. Officer Gilliam, and ultimately several other cars, took off in pursuit. After a high-speed chase, reaching at times speeds of between 50 and 75 miles per hour, the fleeing automobile collided with a stopped automobile in the 2200 block of Edmondson Avenue. The appellant was arrested. The leasing agreement from National to Robert Anderson was recovered from the glove compartment. The appellant was not a licensed driver.

Robert Anderson was not called as a witness by the State. The appellant took the stand and claimed that Robert Anderson was his cousin. The appellant claimed that he had gone with Robert Anderson to rent the automobile. He claimed that Robert Anderson gave him the keys and permitted him to drive the car. The ignition keys were in the car when it was ultimately stopped and there were no indications of a forced entry nor of hot-wiring.

The State relies upon the theory that since the lease from National to Anderson in no event authorized the

appellant to drive the automobile, his operating of the car was, *ipso facto*, an instance of Unauthorized Use. The State's position is predicated upon certain comments made by the trial judge in the course of denying the appellant's Motion for a New Trial:

"The owner of the car was the rental company. They had the equivalent of that person here by virtue of the agreement of American Motors which was the actual lawful owner of the vehicle that had been rented so the owner of the car really did appear to testify against you and he said you have no authority to operate this vehicle under the contract because the fellow who rented the car didn't have any right to let you rent it. It was a clear case of unauthorized use even if the fellow that rented the car were to appear. You had no business driving a rented car without a license, especially when you are an escapee, and you belong in an Institution and certainly anybody who authorized you to drive a car under those circumstances is in danger of going to jail himself. Nevertheless, if anybody was given the opportunity to put on a defense, I think you were and I can't image a clearer case of guilt."

The State's theory of the case is not tenable. It confuses an unauthorized use *ex contractu* with an Unauthorized Use *ex delicto*. The purport of Article 27, § 349, can best be appreciated after a thumbnail sketch of how it came to be. It is an offshoot of § 348 and shares with it an ancestry tracing back to 1547. Horse stealers were more threatening to the pillars of Tudor society than other mere thieves. Chapter 13 of the Acts of 1 Edw. VI removed the benefit of clergy from them, thereby condemning them to the gallows. In 1744, the Colonial Assembly of Maryland brought over the English horse stealing statute with its penalty of "death as a felon without benefit of clergy".[1] In 1799, coverage was ex-

---

1. Ch. 20, Acts of 1744.

tended to cover the theft of a "jack, jenny or mule".[2] Subsequent amendments added sundry varieties of livestock and wagons to the protected list of chattels. In 1809, the maximum penalty was lowered to fourteen years in the penitentiary.[3] The present Unauthorized Use shoot branched off from the parent stem in 1880.[4] It filled the gap sometimes left by the absence in the unlawful taker of an *animus furandi*. It applied to "any person . . . who shall . . . take and carry away out of the custody or use of any person . . . any horse, mare, colt, gelding, mule, ass, sheep, hog, ox or cow, or any carriage, wagon, buggy, cart or any other vehicle" though taken for his "present use, and not with the intent of appropriating or converting the same". Chapter 422 of the Acts of 1918 heralded the arrival of the Automotive Age by appending to the phrase "any other vehicle," the perhaps superfluous clarification "including motor vehicle as defined in the laws of this State relating to such." See generally *Wright v. Sas*, 187 Md. 507, 510-511, 50 A. 2d 809. In broad import, "horse thieves" imperceptibly had become "car thieves". Their more venial sidekicks, "joyriders," experienced the same transformation without breaking stride. *Plus ca change, plus c'est la meme chose.*

It will thus readily be appreciated that what was once called the "Horse Stealing Statute" and what is now called the "Larceny of a Vehicle Statute" is similar to common law larceny in all respects except that it establishes special penalties when the objects of the larceny are designated means of locomotion or conveyance. The "Unauthorized Use Statute" is similar to its senior counterpart in all respects except that there is no element of "an intent permanently to deprive the possessor of the item taken". An intent temporarily to deprive is sufficient. As Chief Judge Orth said for this Court in

---

2. Ch. 61, Acts of 1799.
3. Ch. 138, Acts of 1809.
4. Ch. 164, Acts of 1880.

*Sizemore v. State,* 5 Md. App. 507, 248 A. 2d 417, at 5 Md. App. 515-516:

> "The distinction between the larceny of a motor vehicle and the larceny of its use (commonly referred to as the unauthorized use of a motor vehicle) is that in the larceny there must be an intent to deprive the owner permanently of his property while in larceny of the use the intent is to deprive the owner temporarily. *Gopshes v. State,* 1 Md. App. 396."

In looking at Unauthorized Use statutes generally, *Perkins on Criminal Law* (2d ed. 1969) points out, at 273, that these statutes contain all the elements of larceny except that of an *animus furandi:*

> "This statutory crime, whether called 'larceny' or not, is in effect an 'included offense.' It has all of the elements of larceny except the intent to steal, and is limited to a small portion of the general subject matter of larceny."

It is, of course, fundamental that larceny is a crime against possession and not against ownership; that an essential element is the taking and carrying away of the stolen item; and that the taking must be trespassory or *de bonis asportatis. Perkins on Criminal Law* (2d ed. 1969) puts the point very concisely at 245-246:

> "The taking of possession, while indispensable, is not sufficient for larceny unless it is a *trespassory* taking. . . . If the taking is consented to by the one from whose possession the chattel is taken, there is no larceny if the consent was not procured by fraud or duress.
>
> . . .
>
> For this trespass it is necessary to find that someone other than the wrongdoer had possession of the money or chattel, and that this possession was brought to an end by a taking by

the wrongdoer (or by another at his instigation), under such circumstances as to amount in law to trespass."

This Court was equally explicit as to the necessity for a trespassory taking in *Farlow v. State,* 9 Md. App. 515, 265 A. 2d 578, at 9 Md. App. 516-517:

"Simple common law larceny is the wrongful and fraudulent taking and removal of personal property from the possession of another against his will, with intent to deprive the person entitled thereto of his ownership therein. *Robinson v. State,* 4 Md. App. 515, 532. The 'taking' refers to the taking of possession from possession of one entitled thereto. Thus it must be a trespassory taking and trespass against possession is the matrix of the common law larceny concept. There has been a constant judicial struggle to ascertain who has possession because an accused cannot, in legal contemplation, trespass against a person's property, if that person does not have possession. Clark and Marshall, *Law of Crimes,* 6th Ed., § 12.00, p. 707."

It is thus apparent that a trespassory taking is an essential element of the crime of Unauthorized Use. As the Court of Appeals said in *Wright v. Sas, supra,* at 513, in pointing out the essential similarity between Unauthorized Use and larceny: "In other important respects it includes elements similar to larceny, e.g., 'take and carry away'."

The State's theory of the case that an unauthorized use in violation of the rental contract will, in and of itself, sustain a conviction for Unauthorized Use under Article 27, § 349, is erroneous. To the extent that the court relied upon that theory in arriving at its verdict, the court was in error. The National Car Rental System was not in possession of the automobile in question on

August 21; Robert Anderson was. Any larceny or Unauthorized Use of that automobile on that day would have required a trespassory taking from Robert Anderson, adverse to his possessory interest. If Robert Anderson gave permission to the appellant to use the automobile, there could be neither a larceny nor an Unauthorized Use.

To lose a theory, however, is not necessarily to lose a conviction. The court's findings in rendering its verdicts were sufficiently general to permit of an alternative theory of the case:

> "I find that you were driving a car you had no authority to drive, that you had the gun with you and you were clearly guilty at that time or you wouldn't have taken all the chances you did to evade, avoid arrest. . . . I haven't the slightest doubt that you had stolen this car or at least had no authority to drive it. . . . [M]y verdict is guilty."

The alternative theory is that the evidence did, indeed, show a trespassory taking from Robert Anderson. This may well have been the theory adopted by the trial judge and if there was support in the evidence for such a theory, we cannot say that he was clearly wrong. There was no necessity for him to spell out his reasoning in arriving at his verdict. In a case tried before the court without a jury, the test as to whether the trial judge was clearly erroneous in reaching a verdict of guilty on the evidence is whether the admissible evidence adduced at the trial either showed directly, or circumstantially, or supported a rational inference of, the facts to be proved, from which he, as the trier of the fact, could fairly be convinced, beyond a reasonable doubt, of the appellant's guilt of the offense charged and due regard will be given to the opportunity of the lower court to judge the credibility of the witnesses. *Williams v. State*,

5 Md. App. 450, 459, 247 A. 2d 731; *Metz v. State,* 9 Md. App. 15, 262 A. 2d 331; Maryland Rule 1086.

Even could the court be deemed to have relied exclusively upon the contract theory arising out of the breach of the rental agreement, nothing therein would contradict the theory of a trespassory taking from Robert Anderson. Even in that event, the verdict of the court would be sustained as not clearly in error, because evidence was present upon which the court could have arrived at the same conclusion upon other grounds. We think that 5 Am.Jur.2d, *Appeal and Error,* § 727 "Reasoning of court below," properly states the Maryland law in this regard:

> "According to the essence of its function, an appellate court is concerned with whether the holding, and not with whether the reasoning, of the decision appealed from is correct, and generally a correct decision will not be disturbed on appeal because it is based on an incorrect ground, especially where the correct ground was formally presented to the court below, though not there acted upon, and the view has also been taken that in a proper case a correct decision should be sustained even though the appellate court finds it necessary to resort to a theory not presented to the court below. The general principle that a correct result will not be set aside because based on an incorrect ground applies also to appeals from decisions of intermediate appellate courts.
>
> Where a decision is based on two grounds, either of which, independent of the other, is sufficient to support it, it will not be reversed on appeal because one of those grounds is erroneous. Similarly, an appellee who had made an alternate pleading need not show that both alternative theories are sustained by the evidence and need not, at his peril, determine

which of the two alternative theories was adopted by the trial court and justify it. If the trial court made erroneous findings, its decision will nevertheless not be reversed on appeal if the findings which it should have made would support its decision. The appellant has the burden of proof that no correct finding would sustain the decision appealed from."

The evidence showing directly or at least supporting a rational inference of a trespassory taking from Robert Anderson came during the recross-examination of Officer Gilliam:

"Q. How did you discover that the car was allegedly stolen?
A. Through information received by calling the person who had the car rented to him.
Q. You called the person?
A. I did not call. Officer Donald Press called the man.
THE COURT: He was your partner I take it?
THE WITNESS: Yes, sir.
Q. He called the rental agency?
A. No, sir, that piece of paper indicates even if he called the rental agency, you can also contact the people that it belonged to.
Q. Who did he contact?
A. I assume he contacted that man later on that morning in reference to the car being stolen. I don't recall the man's name.
MR. WOLF: Your Honor, could we pass that back to the officer so I could question him on this?
Q. The name that appears on here as the driver which I presume means rentor is Robert William Anderson of 3709 Spaulding Avenue. Is that the person that your partner called?
A. Yes, as long as he knows what it is.

Q. Of your own knowledge, you don't know
what transpired between the private party and
the—
A. Except that Press stated to me that the sub-
ject didn't know the car was stolen."

That evidence, to be sure, was hearsay. It was, more-
over, hearsay twice compounded. Officer Gilliam testified
as to something told to him by an out-of-court declarant,
his partner Officer Donald Press. Officer Press, in turn,
was passing on the substance of a telephone conversa-
tion with an even more remote out-of-court declarant,
Robert Anderson. It was, however, not simply not ob-
jected to, it was brought out by the appellant. It is
relevant and it is probative. The Court of Appeals aptly
summarized the proper consideration of such evidence,
through Chief Judge Carroll Bond, in *Laporte Corpora-
tion v. Pennsylvania-Dixie Cement Corporation,* 164 **Md.**
642, 165 A. 195 (1933), at 164 Md. 649-650:

"Objectionable evidence admitted without ob-
jection has the force and effect of proper evi-
dence. *Mahoney v. Mackubin,* 54 Md. 268, 274.
And it is settled that evidence introduced with-
out limitation of purpose is in for all purposes.
*Morrison v. Whiteside,* 17 Md. 452, 459; *Eckels
& Sons Ice Mfg. Co. v. Cornell Economizer Co.,*
119 Md. 107, 116, 86 A. 38."

Of similar import but later vintage is *James v. State,*
5 Md. App. 647, 248 A. 2d 910 (1969), at 5 Md. App.
651:

"Even assuming that the statement in the
hospital record to the effect that appellant had
beaten Tracey on numerous occasions would
not have been properly admissible as part of
the hospital record had objection been made
to it, there was no objection to such statement
so that, although hearsay, it may be afforded
the same probative force as if competent, the

> weight thereof being for the trier of fact. *Hyman v. State,* 4 Md. App. 636, and cases cited at page 642."

The hearsay was legally sufficient to have supported a finding of the vital element of a trespassory taking. The finding of guilt on the charge of Unauthorized Use of a Motor Vehicle was not, therefore, clearly erroneous.

The remaining contentions give us little pause. The appellant questions the legal sufficiency of the evidence with respect to the conviction for receiving stolen goods. Testimony permitted a finding that on June 28, 1971, Mr. Albert Myers was robbed of a Smith and Wesson .38 revolver. When the appellant was arrested less than two months later, that revolver, fully loaded, was recovered from under the driver's seat of the car he alone was driving. It is axiomatic that exclusive possession of recently stolen goods, absent a satisfactory explanation, permits the drawing of an inference strong enough to sustain a conviction that the possessor was a receiver of stolen goods. *Jordan v. State,* 219 Md. 36, 148 A. 2d 292 (1959) ; *Brewer v. Mele,* 267 Md. 437, 449, 298 A. 2d 156 (1972). See also opinion of Judge Cardozo in *People v. Galbo,* 218 N. Y. 283, 112 N. E. 1041, 1044 (1916). Although the appellant testified, he gave no explanation of possession. Rather he denied possession. His denial was belied by Officer Gilliam's testimony that seconds before the arrest, he observed the appellant "motion as though he was taking something or putting something by his leg under the driver's seat." The evidence was legally sufficient to permit the verdict.

The appellant's final contention is that he was denied the right to have compulsory process for obtaining witnesses in his favor as guaranteed by the Sixth Amendment. *Washington v. Texas,* 388 U. S. 14, 87 S. Ct. 1920, 18 L.Ed.2d 1019 (1967). On the afternoon before trial, he gave the Sheriff summonses for several witnesses. They were marked as served by the Sheriff, but they did not show up in court. The trial judge quite properly

informed the appellant that it was his responsibility to locate his own witnesses, with the aid of the Sheriff in serving the summonses. The judge pointed out that the appellant should have arranged for the attendance of his witnesses further in advance of trial if he wanted "to be sure of getting them." Under the circumstances, we do not feel that the judge abused his discretion in denying a continuance. We note that there was no request that the witnesses be attached.

*Judgments affirmed.*