MATTER OF BRYANT KEITH McNEIL AND
SHERRELLE YOLANDA McNEIL

[No. 742, September Term, 1973.]

*Decided June 4, 1974.*

The cause was argued before MOYLAN and POWERS, JJ., and ROBERT F. SWEENEY, Chief Judge of the District Court of Maryland, specially assigned.

*Gerard A. Meola* for appellant.

*George A. Eichhorn, III, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Barry Buckley* on the brief, for appellee.

SWEENEY, J., delivered the opinion of the Court.

In the case at hand, we are concerned with the efforts of a mother to regain the custody of her two infant children, who were removed from her care pursuant to an order of the Circuit Court of Baltimore City, Division of Juvenile Causes.

The record indicates that the case had its beginnings on January 24, 1973, when the mother, Portia McNeil (Appellant herein) filed a petition in the Division of Juvenile Causes alleging that her children, Bryant Keith McNeil, age 4¹/₂ years, and Sherrelle Yolanda McNeil, age 3¹/₂ years, were dependent children.

On February 9, 1973, the matter first came on for hearing before Juvenile Court Master Paul A. Smith, Jr., who, with the consent of the mother, recommended the commitment of both children to the Department of Social Services and an order to that effect was passed. The Department of Social Services (hereinafter referred to as Social Services) thereafter placed both children in foster care.

On July 20, 1973, the Appellant filed a Petition for Review of Commitment, alleging that she was then able to care for the children, and that their continued commitment to Social Services was not in their best interest. A hearing on the Petition was originally scheduled for August 31, 1973, but was postponed for 30 days at the request of Social Services so that it could obtain certain medical information concerning the children.

On September 27, 1973, Master Smith conducted a four-hour hearing on the Petition, at which the Appellant appeared and testified, as did certain medical witnesses whose testimony was favorable to the Petitioner's cause. The record does not reveal which party had issued summonses for the doctors. At the conclusion of the hearing, the Master recommended that the commitment to Social Services be rescinded and that the children be returned to the custody of the mother. An order to that effect was signed by Judge Robert I. H. Hammerman on the date of the Master's hearing. On that same day Social Services filed exceptions to the report of the Master, and the matter was set down for a hearing before Judge Hammerman on October 17, 1973.

That hearing began with the following colloquy between Appellant's counsel and the court:

> MR. MEOLA: Your Honor, I was given a message
> by your Bailiff this morning. Mrs. McNeil

called your Honor's office saying that her child was sick and couldn't appear in court. She called me yesterday to tell me about the sickness. I, at that time, I told her that the court may not be receptive to a continuance and she said she would be here this morning. I can only assume that the sickness is worse this morning when she —

THE COURT: I don't know that you can assume that it is worse. You can assume she's not here.

MR. MEOLA: Yes, your Honor, she's not here at this time. Also, the review of commitment hearing before Master Smith, Doctor Hahn appeared from Johns Hopkins Hospital to testify. I assume that the same summonses are issued, that they would be here today, only I'm informed that Doctor Richardson has appeared instead, and I would like Doctor Hahn to be available, and I want our chance to subpoena him.

THE COURT: He was not summoned for today's hearing.

MR. MEOLA: Your Honor, I thought he would have been.

THE COURT: But he wasn't.

MR. MEOLA: No, your Honor.

THE COURT: We are going to proceed today, Mr. Meola. Was this case before me already once?

MR. MEOLA: No, your Honor.

THE COURT: Postponed — well, we are going to proceed this morning. I think you have had every opportunity to summons Doctor Hahn and you did not choose to do so, that was your decision to make, but we have, I know, many people in the courtroom today involved in this matter, and not everyone is involved in this matter, but there are quite a few, I believe, who are involved in this matter, and there was

no request for a continuance or postponement of this. I think the respondent has had every — the petitioner in this case, has had every opportunity to do what was necessary and, we will proceed.

The entire record of the hearing before Judge Hammerman is barren of any inquiry by him as to the nature of the child's illness, or whether the child was ill at home or hospitalized; nor did he inquire as to whether the mother had failed to appear at any previous proceeding throughout the ten-month history of the matter, or whether she had been generally cooperative with her counsel, representatives of Social Services, or the medical personnel who had examined and cared for her children from time to time.

After this dialogue between the court and counsel, Appellant's counsel sought permission of the court to summons Dr. Ivan W. Laurich, psychiatrist for the Supreme Bench. Dr. Laurich was not available, but two evaluations prepared by him were introduced into evidence. His first evaluation, which had been available to Master Smith at his hearing on September 27th, withheld a final report or recommendation. In that report Dr. Laurich stated that "[i]n the absence of this data, I do not consider it feasible for me to make any statement regarding the role of Mrs. McNeil in the genesis of her children's difficulties." The second evaluation by Dr. Laurich was made after further interviews with Mrs. McNeil. In that evaluation, the physician stated his view that both children had psychiatric disturbances, and that Sherrelle suffered from psycho-social dwarfism. He described Bryant as "dependent, clinging and demanding." His observations of both children, however, were based on his examination of medical records prepared by others, and not on his personal examination or evaluation of the children. That report concluded as follows:

"In my opinion, although Ms. McNeil cannot be described on the data available as being psychotic, there are sufficient indications of her being

emotionally disturbed to the extent that her style of handling her children has played a significant role in the genesis of their serious disturbances. Certainly at this stage, she is unable to objectively understand the nature of their disturbances and their special management needs. In view of this, it is recommended that continuation of the commitment to the Department of Social Services would definitely be in the children's best interests. Since they are currently residing with their mother, it is recommended that they remain there, subject to supervision of the Department of Social Services, in conjunction with the staff of the Children's Medical Surgical Clinic at Johns Hopkins, who have been in contact with the family. I have confirmed with Dr. Sung-Up Hahn, Director of that Clinic, that his staff would be available for counseling of Ms. McNeil, collaboration with the Department of Social Services caseworker, and serial review of the childrens' status. Should there be a failure on Ms. McNeil's behalf to follow through with this kind of management, or should there be substantial regression or deterioration in the status of either of the children, it is my opinion that this would undoubtedly reflect her incapacity to parent these children and an indication that their permanent removal from her custody would be in their best interests, in view of the serious nature of the disturbances which they have already displayed — even though their conditions substantially improved during their period of hospitalization, a significant regression in their conditions should be seen as particularly damaging and its avoidance should be attempted at all costs."

It appears that Appellant's counsel had not seen Dr. Laurich's report until it was handed to him in open court at the hearing and introduced by him as a Petitioner's exhibit. He thereupon asked for a continuance to summons a Dr. Pesidan who had testified at the hearing before the Master,

evidently intending to use Dr. Pesidan to rebut some of the critical comments concerning Mrs. McNeil set out in Dr. Laurich's evaluation. This motion for a continuance was denied. Appellant's counsel then made a motion to dismiss the exceptions filed by the Department of Social Services, which was also denied.

From a thorough reading of the record, it is obvious that Appellant's counsel, although long experienced in juvenile proceedings, had appeared at the hearing unaware that it was a *de novo* proceeding and that his obligation to prove Appellant's case was as great at the hearing before Judge Hammerman as it had been before the Master on September 27th. It does not appear that he had summonsed any witnesses, apparently having relied on the Department of Social Services to summons the same witnesses who had appeared at Master Smith's hearing. At various times in the initial stages of the hearing, Judge Hammerman advised Appellant's counsel that the proceeding was *de novo* and that he had the burden of going forward. The validity of the judge's position is made abundantly clear by a reading of Maryland Rule 908, which states, in pertinent part:

"e. *Masters.*

"1. Hearing Before Master.
The master shall hear such cases as may be assigned to him by the court and upon the conclusion of the hearing shall announce his findings and recommendations. All papers relating to the case together with the master's findings and recommendations shall then be transmitted to the judge.

"2. Exceptions to Findings or Recommendations.
The petitioner or any party may file written exceptions to the master's findings or recommendations or any part thereof within five (5) days after the hearing. Exceptions by a petitioner after a delinquency hearing may only be taken by the State's attorney. The clerk designated by the court, upon the filing of such exceptions, shall notify the petitioner and all parties of the time and place of the hearing before the judge.

"3. Order of Judge.
In the absence of exceptions, the master's findings and recommendations shall promptly be confirmed, modified or remanded by the judge. If, within the specified time, exceptions are filed, the judge shall hear the entire matter or such specific matters as set forth in the exceptions *de novo.*"

See *Matter of Anderson,* 20 Md. App. 31, *cert. granted.*

Finding himself before the court with his client absent and no witnesses summonsed in her behalf, and with the repeated refusals of the court to grant him a continuance, Appellant's counsel then called as his own witness Dr. James Rubenstein, an assistant resident pediatrician at the Johns Hopkins Hospital, who had been summonsed by Social Services. It is not necessary for our purposes to deal at any great length with the testimony of Dr. Rubenstein, except to say that it was devastating to Appellant's case, as it was the Doctor's conclusion that the difficulties of the children were attributable, at least in a substantial part, to an abnormal maternal-child relationship, and it was his opinion that the daughter, Sherrelle, would be better off in an institution than in the mother's home.

According to Dr. Rubenstein's testimony, he had never had any contact with Bryant, and his contact with Sherrelle began on August 3, 1973, at which time she was a patient at Johns Hopkins Hospital. It appears that at the time of her admission to the hospital, Sherrelle was living in a foster home in which she had been placed by Social Services pursuant to her commitment to that department by Master Smith at his hearing on February 9, 1973. After describing her symptoms and medical history in some detail, Dr. Rubenstein advised the court of his diagnosis that the child was suffering from "psycho-social dwarfism." He testified that Sherrelle had improved while in the hospital and had gained about seven pounds. At this point, the following colloquy occurred:

Q. You testified that the child weighed eleven kilograms when she was introduced in the hospital?

A. Right.

Q. That's about twenty-five pounds?

A. Approximately.

Q. Would your diagnosis be affected by the fact that when the child was placed in foster care, the child weighed thirty-six pounds?

MR. BUCKLEY: Objection, no proof of that.

THE COURT: I'll sustain the objection, and I would also state, it seems to me, Mr. Meola, that you're trying to impeach your own witness here. You're asking a witness to take the stand as your own witness. You're asking him to give a diagnosis and now it seems to me you're trying to impeach his diagnosis.

MR. MEOLA: Obviously, this witness must be an adverse witness to that extent.

THE COURT: Not at all, you called him as your witness.

MR. MEOLA: Your Honor, I've been placed under great limitations, as I do not have the mother here. I do not have the doctors here to testify. The first time —

THE COURT: That may be, but you still called Doctor Rubenstein as your witness. I'm not restricting you in the matter of trying the case. I'm merely making a comment. Realizing that you may be belaboring under more difficulties than you had hoped for, I don't want to restrict you under the law, I'm just making the observations without telling you to stop.

The court thereafter did permit Appellant's counsel some latitude in his questions to the witness, but counsel elicited no responses favorable to Appellant's cause. Counsel for the Department of Social Services conducted no cross-examination of Dr. Rubenstein and no other witnesses were called in the proceeding.

Appellant's counsel then made a proffer of evidence that

he would have presented had he been granted a continuance. He stated:

> "Your Honor, Mrs. McNeil — If Mrs. McNeil was here, she would have testified that her daughter, Sherrelle, weighed thirty-six pounds when she went into foster care. This child had lived both with her and her husband, the father, the mother, the maternal grandparents for periods of time."

Counsel also stated that:

> "If Dr. Hahn was here, he would testify to the fact that it was his opinion that the child being moved from family to family is detrimental to the child. That the child should be placed in one environment where it's going to stay.
>
> " . . . and that this stable environment could be done in the home of the mother with follow-up care after that point. Your Honor, that is basically it."

Counsel for the Department of Social Services thereupon made a motion that the Petition for Review of Commitment be dismissed and, after extremely brief argument by Appellant's counsel, the motion to dismiss was granted.

Judge Hammerman delivered a rather lengthy oral opinion, in which he said that the very evidence presented by Appellant "totally rejects the position taken by the petitioner."

After the dismissal of the Petition, a lengthy colloquy ensued between the court and counsel for both parties, at the end of which the court directed that the children be permitted to remain with their mother temporarily, pending the submission to him of a report containing the combined medical opinions of Dr. Rubenstein and Drs. Hahn and Pesidan, the latter two being the physicians who had testified before the Master and whom Appellant's counsel had wanted to testify before Judge Hammerman.

Judge Hammerman stated that if the consensus of the medical opinion was that the best interest of the children would be served by having them stay with their mother,

with appropriate out-patient services being provided by Social Services, he would probably defer to such a recommendation.

Appellant's counsel asked the court to direct the doctors to consult with Appellant as a part of their preparation for the report, to which the court replied:

> "I'm not going to require the doctors. That's entirely up to them as to how they prepare their report. If they feel talking to Mrs. McNeil is necessary, and/or appropriate, if they feel it is not necessary and/or not appropriate, that is up to them. I'm not going to tell them how to compile their report."

Before concluding the hearing, the court also made the following statement:

> "Now, my allowing the status quo to continue at this moment, is assuming that it will be just that. That it will be the status quo in the event that there is any significant change in conditions at home, and the Department, by reason of its being a legal custodian for these children, is authorized to take immediate action in the home situation, and I wanted them to realize that."

The record does not contain the combined medical report requested by Judge Hammerman, nor is there any indication in the record that the report was ever submitted to him. It appears, however, from statements made in Appellant's brief, that a report was submitted and that its recommendations were adverse to the interest of Appellant, and that subsequent to the submission of the report, Sherrelle was removed from Appellant's home. At the time of oral argument, Bryant was still living with his mother.

On appeal Appellant presents four questions, three of which, we believe, may be disposed of summarily. Appellant alleges that it was erroneous for the court to permit Social Services to make the determination as to whether the children should be permitted to remain in the Appellant's

home. We find no error in this action of the court. By virtue of the Order of February 9, 1973, Social Services was the legal custodian of the children and, as such, had "the right to have physical possession and control of [the children] or [minors] and to determine where and with whom [they] live . . .". Article 26, Section 70-1 (s), Annotated Code of Maryland (1973 Repl. Vol.); now Courts and Judicial Proceedings Article (Court's Art.) Section 3-801 (r). It is true that the court directed that the children should remain in the Appellant's home pending the receipt of the combined medical report, and it would seem, therefore, appropriate that prior to the removal of either child from the home, the report should have been placed in the record, or at least some notation made therein that the removal of Sherrelle was in accordance with the recommendations of the report. The court, however, in its concluding comments, had specifically authorized Social Services to remove the children if it found a significant change in the status quo, and did not direct the agency to advise him of any such removal. We find nothing in the record on which we could hold that Sherrelle's removal from Appellant's home in any way violated the trial judge's order.

Similarly, there is no merit in Appellant's contention that the trial court erred in failing to conduct a separate dispositional hearing. Such a hearing is required only after the court has held an adjudicatory hearing in a *delinquency* case and has sustained the allegations of the petition considered at said hearing. Article 26, Section 70-17, Annotated Code of Maryland (1973 Repl. Vol.); now Courts Art. Section 3-829. There is no requirement that a dispositional hearing be held as part of a *dependency* proceeding such as the case at hand. In the instant case the matter before the court was a Petition for Review of Commitment of the Order of February 9, 1973. Since the court dismissed that Petition, a dispositional hearing was not only not required but would have been purposeless.

We are only slightly more troubled by Appellant's contention that the trial court erred in refusing to compel the physicians to meet with Appellant in the course of the

preparation of the combined medical report that they were to submit to the judge. In view of Appellant's counsel's insistence throughout the proceeding that both of the written reports of Dr. Laurich and the testimony of Dr. Rubenstein contained factual errors harmful to Appellant's position, it does appear that it would have been the better use of discretion for the judge to have required the doctors to consult with Appellant in the preparation of their report. It must be remembered, however, that this report was only requested after the Petition had been denied, and legal custody had been continued in Social Services. Error in this particular, therefore, would not affect the denial of the Petition, and it is that denial which is the subject matter of this appeal.

Appellant's remaining contention is that the trial court erred in not granting a continuance. Several requests for a continuance were made during the hearing. The first such request was made at the very outset, when counsel advised the court of the inability of the mother to be present. Although this request was not completely articulated, it is abundantly clear that counsel was attempting to seek a continuance because of the absence of his client, and it is equally clear that this request was denied by the court. Subsequently, counsel made formal motions for continuances, so that he could summons three medical witnesses: Dr. Laurich, Dr. Hahn, and Dr. Pesidan.

Maryland Rule 527 provides that the grant of a continuance is within the discretion of the trial court, and it is the general rule of law that unless the judge acts arbitrarily in exercising that discretion, his action will not be interfered with on appeal. *Bugg v. Cecil County Comm'rs.*, 261 Md. 507; *Butkus v. McClendon*, 259 Md. 170; *Brooks v. Bast*, 242 Md. 350; *Gibbs v. State*, 18 Md. App. 230; *Robinson v. State*, 17 Md. App. 451; *Johnson v. State*, 10 Md. App. 652.

We can think of no right more fundamental to any parent than to be given a reasonable opportunity to be present at any judicial proceeding where the issue is whether or not the parent should be permitted to have custody of its child. We

believe that there was grave and serious error on the part of the trial judge in compelling the hearing to proceed in the absence of the Appellant, and we find that it was arbitrary and unreasonable for him to refuse to grant a continuance so that she might be present.

The Maryland General Assembly has clearly expressed its recognition of the principle that the primary right to rear and nurture a child rests in its parents and not in the State, and it is only under the most extraordinary circumstances that a parent may be divested of that right and custody of a child placed in the hands of others. Article 26, Section 70 (4), now Courts Art. Section 3-802 (a) (5), states that one of the purposes of the special legal provisions relating to juvenile causes is "[t]o separate a child from his parents only when necessary for his welfare or in the interest of public safety." *

In *Matter of Wooten*, 13 Md. App. 521, 528, we indicated that the special concerns expressed in our juvenile law were not merely meaningless, high sounding phrases. We reiterate that view.

Judge Hammerman recognized the special concern that should be exercised in cases involving the rights of parents to custody of their children. Towards the close of the hearing, he said:

> "Here, we are talking about right of parents to their children, and I don't think we can be too careful when we are dealing with the rights of parents to their children. I don't think we can be too careful, and if the lawyer is maintaining a certain position to be so, I think he's entitled to the opportunity to at least try to show it. If he can't show it, he can't show it, but I think he's at least entitled to the

---

* Legislative concern for the rights of parents is even more clearly expressed in the provisions of the Courts and Judicial Proceedings article regulating juvenile proceedings in Montgomery County. Section 4-504 (b) of the Courts Art. states that "[a]fter giving the parents a reasonable opportunity to be heard . . . the court may . . . [d]etermine who will have custody of the person of the child . . .". Although this language is applicable only to Montgomery County, the principle is certainly applicable to every Maryland juvenile court.

opportunity. But, as I have indicated, if there is any
. . . .".

It is difficult for us to conceive how the judge could enunciate this philosophy and then proceed with the hearing not only in the absence of the Appellant, but without making a realistic inquiry into the circumstances of her absence, or ascertaining whether she had been guilty of a pattern of unconcern. The record before the judge made it readily apparent that throughout the entire proceedings involving her children, the Appellant had acted in a responsible manner. It was she who had filed the original petition seeking assistance for those children, which resulted in their commitment to Social Services on February 9, 1973. Although she consented to that commitment, it is obvious that she did not do so from any desire to be rid of the children or to shirk the responsibilities of parenthood, because it was she who filed the Petition for Review of Commitment, asking that her children be returned to her. When a hearing on that Petition was set for August 30th, it was not the Appellant but Social Services who requested a postponement of that proceeding, and Appellant appeared and testified when the hearing before the Master was finally heard on September 27th. It is ironic that this woman's Petition for the return of her children was dismissed at a hearing which she was unable to attend because at that very time, according to the uncontradicted statement of her counsel, she was caring for one of those selfsame children, who had become ill.

It does not appear from the record that Judge Hammerman, in denying the request for continuance, gave any consideration at all to the question of whether the mother's testimony would be competent or material. We believe that her testimony could have been very important, because in his proffer at the conclusion of his case, her counsel advised the court that if she were there, she would testify that after Sherrelle was removed from her home and placed in a foster home, the child's weight dropped from thirty-six pounds to twenty-five pounds. This would certainly have been of probative value in determining

whether the children's emotional and physical difficulties were actually caused by a bad maternal environment.

We believe the case before us is one of those exceptional instances where refusal to grant a continuance was so arbitrary as to constitute a denial of due process. We find this case analogous to *Thanos v. Mitchell*, 220 Md. 389, where the plaintiff was unable to be present at trial due to her illness and the trial court refused to grant a continuance, notwithstanding medical certification as to the disability of the plaintiff. The Court of Appeals found this to be reversible error, stating that to require the case to go to trial without plaintiff's presence was "like the play of Hamlet with Hamlet left out". *Thanos v. Mitchell, supra,* at 393.

We do not hold that it is never permissible to hold a custody hearing in the absence of one or both parents. Under some circumstances such a hearing could be necessary and proper, but no such circumstances were present in the instant case. There certainly was nothing of an emergency nature about the hearing of October 17th, for both children were permitted to remain with the Appellant for several weeks after Judge Hammerman's decision, and, as we noted earlier, Bryant was still in Appellant's care when the matter came on for argument before us on March 26, 1974.

Although Judge Hammerman assigned no reason for his refusal to grant the continuance, it seems that he did so out of concern for the convenience of the other witnesses in the case who were then present in his courtroom. While recognizing the reluctance of the court to grant a last minute continuance when duly summonsed witnesses have properly responded to a summons, we believe it so obvious as not to require discussion that the right of a parent to be present at a hearing involving the custody of her child must be given precedence over minor inconvenience to lesser involved persons. A myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to due process an empty formality. *Chandler v. Fretag*, 348 U. S. 3, 99 L.Ed. 4, 73 S.Ct. 1; *Walter v. State*, 4 Md. App. 373.

It may very well be, as Judge Hammerman found, that the best interest of these children required that they be

separated from the Appellant and placed in another environment, but the Appellant was entitled to a reasonable opportunity to be present and assert her view as to why her children should be returned to her care. Since we find that she was denied that reasonable opportunity to be heard, this case must be remanded for a new hearing. At that hearing, the burden will, of course, be on Appellant to show through such medical testimony and other evidence as may be appropriate, including her own testimony, that the commitment of her children to Social Services should be rescinded and the children returned to her care, custody and control.

Having reached the conclusion that this cause must be reversed because of the arbitrary refusal to grant a continuance to permit the mother to be present, we need not reach the question of whether there was an abuse of discretion in failing to grant a continuance so that the various medical witnesses could be summonsed.

> *Order of 17 October, 1973 denying petition for review of commitment vacated; case remanded for a new hearing in accordance with this opinion.*